**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0226n.06

No. 14-3375

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 24, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| QUARTO MINING COMPANY, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **ON PETITION** FOR REVIEW |
| v. | ) | OF A DECISION OF THE |
| | ) | BENEFITS REVIEW BOARD |
| CLIFFORD MARCUM, SR.; | ) | |
| DIRECTOR, OFFICE OF WORKERS' | ) | **OPINION** |
| COMPENSATION PROGRAMS; | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF LABOR, | ) | |
| | ) | |
| **Respondents.** | ) | |
| | ) | |

**BEFORE: NORRIS, ROGERS, and WHITE, Circuit Judges.**

**PER CURIAM.** Quarto Mining Company petitions for review of a decision issued by the Benefits Review Board ("the Board"), which affirmed the decision of an administrative law judge ("ALJ") who awarded compensation to respondent Clifford Marcum, Sr., a former coal miner, under the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972 ("BLBA"), 30 U.S.C. §§ 901-944. Petitioner contends that the ALJ wrongly applied the statutory presumption concerning coal dust induced pneumoconiosis and improperly discredited the medical opinions of two physicians who attributed Mr. Marcum's disability to smoking rather than coal dust exposure. The company also takes issue with the ALJ's finding that Mr. Marcum had fifteen years of qualifying coal-mining employment, which, in combination with other factors not in dispute, triggers a statutory presumption that the miner is

totally disabled due to pneumoconiosis. 30 U.S.C. § 921(c)(4); 20 C.F.R. § 718.305(b)(1). Finding no merit in these contentions, we deny the petition for review.

"In black-lung benefits cases, we review the Board's legal conclusions *de novo* and review the ALJ's decision (not the Board's) to determine whether it was supported by substantial evidence." *Cent. Ohio Coal Co. v. Dir., Office of Workers' Comp. Programs*, 762 F.3d 483, 488 (6th Cir. 2014). "Substantial evidence means such relevant evidence as a reasonable mind might accept, as adequate to support a conclusion." *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1068-69 (6th Cir. 2013) (quoting *Kolesar v. Youghiogheny & Ohio Coal Co.*, 760 F.2d 728, 729 (6th Cir. 1985)(internal quotation mark omitted)). While this court performs an independent review of the administrative record, we may not substitute our judgment for that of the ALJ even if we were inclined to do so as long as the underlying opinion is supported by substantial evidence. *Cent. Ohio*, 762 F.3d at 488-89. With these precepts in mind, we turn to the decisions of the Board and the ALJ.

A. Mr. Marcum's Employment History

We begin by reviewing Mr. Marcum's employment history. At the time of the formal hearing before the ALJ in 2012, Mr. Marcum was 80 years old. According to his recollection, he worked for about twenty-five years as a coal miner, both above and below ground. He did so in West Virginia and Ohio. He retired in 1994.

After hearing Mr. Marcum's testimony and reviewing the administrative record, the ALJ made the following findings of fact with respect to the length of qualifying coal mine employment:

> I agree that Claimant has failed to establish at least 15 years of underground coal mine employment. Employer also argues that miner has not established that his conditions of aboveground employment were "substantially similar" to

underground employment . . . . I disagree. According to miner's CM-911a form and social security records, miner worked for Consol from 1971-1994, a period of 23 years. This was clearly an underground mine site as miner testified that he initially worked underground and was later switched from above to belowground and back up again. Therefore, miner does not need to show comparability in conditions. As such, I find that miner has established at least 25 years of qualifying coal mine employment and is thus entitled to the rebuttable presumption that his total disability arose from pneumoconiosis pursuant to § 718.305. The burden now shifts to the Employer to establish that 1) Claimant does not suffer from pneumoconiosis or 2) Claimant's total disability was not caused by coal mine employment.

(A.R. 200-201) (citations and footnotes omitted). The Board affirmed the ALJ's determination of this issue, which it found to be "rational and supported by substantial evidence in the form of claimant's testimony at the hearing, his employment records, and the absence of evidence to the contrary." (A.R. 211) (citing *Tenn. Consol. Coal Co. v. Crisp*, 866 F.2d 179, 185 (6th Cir. 1989)). With respect to whether Mr. Marcum's aboveground work was sufficiently "comparable" to his underground mining experience to entitle him to the rebuttable presumption of Section 411(c)(4) of the BLBA, 30 U.S.C. § 921(c)(4), the Board relied upon our decision in *Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050 (6th Cir. 2013). In that case, we stated that "no showing of comparability of conditions is necessary for an aboveground employee at an underground coal mine," *id.* at 1058, for him to establish the right to the Section 411(c)(4) rebuttable presumption that he is "totally disabled due to pneumoconiosis."

We detect no error of law on the part of either the ALJ or the Board in determining that Mr. Marcum qualified for the Section 411(c)(4) presumption. And, our review of the administrative record leads us to conclude that substantial evidence supported the ALJ's finding that Mr. Marcum had twenty-five years of qualifying coal mine employment.

We now turn to the medical evidence that Mr. Marcum's totally disabling respiratory or pulmonary impairment was caused by coal mine employment.

B.  Medical Evidence

At the outset, the ALJ noted that the parties had stipulated that Mr. Marcum is totally disabled within the meaning of the governing regulations.  For purposes of this appeal, there are four physicians whose opinions are at issue.

### 1.  Dr. Paul Knight

Dr. Knight, who is board-certified in internal medicine, examined Mr. Marcum at the request of the Department of Labor.  The doctor noted that Mr. Marcum smoked a package of cigarettes per day for 33 years.  He diagnosed COPD (chronic obstructive pulmonary disease) and coal worker's emphysema based upon a "history of significant tobacco smoking" with respect to his COPD and "extensive deep coal mining work and positive chest x-ray of S/P nodule, perfusion 1/1."

### 2.  Dr. John Schaaf

Dr. Schaaf examined Mr. Marcum on August 5, 2010.  Like Dr. Knight, he found Mr. Marcum to have been a pack-a-day smoker for thirty years, quitting in 1981.  With respect to his chronic bronchitis, the doctor stated, "[h]is chronic bronchitis began while he was working in the coal mine environment in an admittedly dusty job.  The chronic bronchitis symptoms began well after smoking cessation.  His coal dust exposure is a significant contributing factor to his chronic bronchitis."

During his deposition, he attributed the chronic bronchitis to exposure to coal dust and his "remote" smoking history.  However, he went on to say that "it is my opinion that his coal dust exposure is the more likely cause of his chronic bronchitis."  Dr. Schaaf disagreed with Dr. Rosenberg's contention, discussed below, that one can distinguish COPD caused by coal dust from COPD cause by smoking.

### 3. *Dr. David Rosenberg*

Dr. Rosenberg examined Mr. Marcum in 2011 at the request of Quarto. He assumed that the miner had smoked a pack-a-day for 33 years, though he recognized that some of the medical records indicated that Mr. Marcum smoked two packs a day for most of that time. In his opinion, which his report explains at some length, "Mr. Marcum does not have the condition of clinical coal workers' pneumoconiosis (CWP)." His report offers this explanation:

> While there is no question coal mine dust exposure can cause significant airflow obstruction which is disabling, just because a given miner has airflow obstruction does not automatically mean that legal CWP is present. The reason for this is that miners are also susceptible for developing disorders which affect the general public. In order to ascertain whether a given miner's disease represents legal CWP versus obstruction caused by other factors, the specific characteristics of the miner's airways disease need to be assessed.

Dr. Rosenberg then summarized how various epidemiological studies have made it possible to distinguish between COPD caused by smoking versus that caused by coal dust. In his view, Mr. Marcum's "pattern of obstruction is not characteristic of obstruction related to past coal mine dust exposure." Rather, it was attributable to smoking.

### 4. *Dr. Peter Tuteur*

Dr. Tuteur was likewise hired to assess Mr. Marcum's physical condition by Quarto. He is board-certified in internal medicine and pulmonary disease. Like Dr. Rosenberg, he concluded that smoking was at the heart of the miner's problem:

> [T]here is no convincing data to indicate the presence of a coal mine dust-induced pulmonary problem. Nevertheless, a diagnosis of chronic obstructive pulmonary disease is substantiated. . . . [T]hough coal mine dust may be responsible for and cause a COPD phenotype clinically indistinguishable among potential etiologies such as cigarette smoking and childhood pulmonary infection, in this case, with reasonable medical certainty, it is not due to the inhalation of coal mine dust, but due to the chronic inhalation of tobacco smoke.

He went on to explain the medical reasons supporting his conclusion at some length. He also cited Dr. Rosenberg:

> [A]s elegantly presented by Dr. David M. Rosenberg in his report of March 14, 2011, the typical distribution of pulmonary changes of COPD caused by cigarette smoking and coal mine dust differ. Though I agree with this concept, it still remains possible because of biologic variation, that the clinical picture depicted in Mr. Marcum could, albeit highly unlikely, represent a coal mine dust-induced process. Yet, the argument of Dr. Rosenberg further reduces the likelihood of such a possibility and increases the robustness of the conclusion that with reasonable medical certainty, in this case the etiology of Mr. Marcum's chronic obstructive pulmonary disease is the chronic inhalation of cigarette smoking superimposed on the substantial risk imposed by childhood pulmonary illnesses.

Having reviewed the medical evidence, the ALJ summarized the requirements for a claimant to establish compensable pneumoconiosis. The regulations define pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 20 C.F.R. § 718.201(a). This definition includes "both medical, or 'clinical', pneumoconiosis and statutory, or 'legal', pneumoconiosis." *Id.* These two variations are defined by regulation in these terms:

> (1) Clinical Pneumoconiosis. "Clinical pneumoconiosis" consists of those diseases recognized by the medical community as pneumoconioses, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment.
>
> (2) Legal Pneumoconiosis. "Legal pneumoconiosis" includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment.

20 C.F.R. § 718.201(a)(1-2). We recently observed that "[l]egal pneumoconiosis is not medical pneumoconiosis; it is a legal fiction—long recognized by courts and later codified in

regulations—designed to facilitate the remedial purposes of the Black Lung Benefits Act." *Sunny Ridge Mining Co. v. Keathley*, 773 F.3d 734, 738 (6th Cir. 2014).

The ALJ first determined that Mr. Marcum had failed to establish clinical pneumoconiosis. The various doctors, except for Dr. Knight, all concluded that the x-rays submitted by claimant failed to support a finding of clinical pneumoconiosis. With respect to the opinions of the various doctors, the ALJ concluded that, with the exception of Dr. Knight, "[n]one of the other physicians diagnosed miner with clinical CWP, a finding that is consistent with my weighing of the objective evidence." Hence, "miner does not suffer from clinical pneumoconiosis."

The ALJ reached a different conclusion with respect to legal pneumoconiosis, and awarded benefits on that basis. He first evaluated the weight to which each examining physician's opinion was entitled. With respect to Dr. Knight, the ALJ gave "little weight to his opinion, which is internally inconsistent." He gave "some" weight to the opinion of Dr. Schaaf. Specifically, "he noted that miner's symptoms developed after miner quit smoking but while he was being exposed to coal dust; therefore, he believed that coal dust exposure was the more likely cause of miner's bronchitis." He also gave more weight to Dr. Schaaf than Dr. Knight because the former is board-certified in pulmonary diseases.

Turning to Dr. Rosenberg, who did not diagnose legal pneumoconiosis, the ALJ found that conclusion to be "inconsistent with the preamble to the Regulations, which recognizes 'that coal dust can cause clinically significant obstructive disease in the absence of clinical pneumoconiosis, as shown by a reduced FEV1/FVC ratio.'" Hence, he gave little weight to Dr.

Rosenberg's opinion that a reduction in the FEV1/FVC ratio[1] cannot be caused by coal dust exposure. This conclusion is at the heart of the instant appeal.

The ALJ also accorded little weight to Dr. Tuteur's opinion that Mr. Marcum did not suffer from legal pneumoconiosis. Essentially, he found that opinion to be overly general and also too dependent on the opinion of Dr. Rosenberg.

In the end, the ALJ found that Quarto had failed to rebut the presumption that coal dust exposure caused Mr. Marcum's disability and therefore held that he was entitled to benefits.

The Board affirmed the decision of the ALJ. As already explained, the BLBA provides that, if the claimant establishes both a history of coal mining employment and a totally disabling respiratory or pulmonary impairment, then "there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis . . . ." 30 U.S.C. § 921(c)(4). Quarto argued that the ALJ wrongly applied that presumption, an argument that the Board rejected for these reasons:

> The administrative law judge rationally determined that Dr. Rosenberg's opinion, that claimant's reduced FEV1/FVC ratio indicated that claimant's impairment was not due to coal dust exposure, is in conflict with the preamble to the 2001 regulations, "which recognizes that 'coal dust can cause clinically significant obstructive disease in the absence of clinical pneumoconiosis, as shown by a reduced FEV1/FVC ratio.'"

The Board went on to explain why, in its view, the ALJ correctly weighed (and discredited) the opinions of Drs. Rosenberg and Tuteur.

---

[1] FEV1 measures the volume of air that can forcibly be blown out in one second, after full inspiration. FVC is an acronym for "forced vital capacity." The ratio is a means of diagnosing obstructive lung diseases.

8

Quarto contends that the ALJ improperly discounted Dr. Rosenberg's opinion because he found it to be at odds with the preamble to the BLBA regulations. Specifically, the regulatory preamble provides in part as follows:

> In addition to the risk of simple CWP and PMF, epidemiological studies have shown that coal miners have an increased risk of developing COPD. COPD may be detected from decrements in certain measures of lung function, especially FEV1 and the ratio of FEV1/FVC. Decrements in lung function associated with exposure to coal mine dust are severe enough to be disabling in some miners, whether or not pneumoconiosis is also present. A severe or disabling decrement in lung function is defined here as an FEV1 @65% of expected normal values; an impairment in lung function is defined as an FEV1 @80% of predicted normal values. An exposure-response relationship between respirable coal mine dust exposure and decrements in lung function has been observed in cross-sectional studies and confirmed in longitudinal studies.

65 Fed. Reg. 79920, 79943 (Dec. 20, 2000).

After Quarto's brief was filed in the instant appeal, this court issued an opinion which considered whether the ALJ properly discounted similar opinions offered by Dr. Rosenberg in the context of a claim for black lung benefits. *Cent. Ohio*, 762 F.3d at 486. As the following quotation makes clear, in *Central Ohio* Dr. Rosenberg offered the same rationale as he did here to reach a conclusion that coal-dust exposure did not cause the claimant's disability:

> The ALJ appropriately declined to credit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL's position that "coal mine dust exposure may cause COPD, with associated decrements in FEV1/FVC." Dr. Rosenberg's medical opinion discusses at great length the effects of both cigarette smoking and coal-dust exposure on the FEV1/FVC ratio. He explains that both DOL and the Global Initiative for Chronic Obstructive Lung Disease overbroadly define COPD as a reduction in the FEV1/FVC ratio, whereas "recent literature (including literature published after D.O.L.'s revisions to the black lung regulations) establishes the limitation of defining COPD as simply a reduction in FEV1 or FEV1% values." In short, Dr. Rosenberg suggests that, contrary to DOL's purportedly oversimplistic definition, there may be forms of COPD that are not correlated with a reduced FEV1/FVC ratio, and those forms of COPD are much more likely to be associated with coal-dust exposure.
>
> Dr. Rosenberg may be right as a matter of scientific fact, but his analysis plainly contradicts the DOL's position that COPD caused by coal-dust exposure

may be associated with decrements in the FEV1/FVC ratio. The ALJ was entitled to consider the DOL's position and to discredit Dr. Rosenberg's testimony because it was inconsistent with the DOL position set forth in the preamble to the applicable regulation. *See A & E Coal Co. v. Adams*, 694 F.3d 798, 801–02 (6th Cir. 2012) (stating that although ALJs need not look at the regulation's preamble to assess doctors' credibility, they are entitled to do so). Central Ohio does not challenge the substance of the DOL's position as articulated in the regulation's preamble—that is, Central Ohio does not argue that COPD resulting from coal-dust exposure is not correlated with a reduced FEV1/FVC ratio. Were Central Ohio to make that argument, this court would need to engage the substance of that scientific dispute. *See Harman Mining Co. v. Dir. of Office of Workers Comp. Programs*, 678 F.3d 305, 314 n.3 (4th Cir. 2012). But this court could do that only after Central Ohio submitted "the type and quality of medical evidence that would invalidate" the DOL's position in that scientific dispute. *Midland Coal Co. v. Dir. of Office of Workers' Comp. Programs*, 358 F.3d 486, 490 (7th Cir. 2004). Central Ohio has presented no such evidence, and it asks this court to make no such determination. *The sole issue presented here is whether the ALJ was entitled to discredit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL position set forth in the preamble, and the answer to that question is unequivocally yes.*

*Cent. Ohio*, 762 F.3d at 491-92 (emphasis added) (footnote and citations omitted).

Because *Central Ohio* had not been decided at the time it filed its initial brief, Quarto addresses it in reply. First, it concedes the obvious: that the ALJ could legitimately consider the preamble in evaluating Dr. Rosenberg's opinion. However, according to Quarto, the ALJ erred in not assessing the post-preamble studies alluded to in Dr. Rosenberg's report because the BLBA prescribes that all relevant evidence related to black lung claims be considered. 30 U.S.C. § 923(b).

We would be the first to concede that Quarto's position may have been helped had *Central Ohio* been decided before litigation in this matter began. *Cent. Ohio* leaves open the possibility that a mining company could muster medical evidence that would invalidate the position taken by the Department of Labor in the preamble. While Quarto contends that Dr. Rosenberg did just that by citing post-Preamble studies, we find nothing to distinguish his

evidence from the evidence that he relied upon, and that we rejected, in *Central Ohio*. The ALJ could therefore appropriately discount the opinions of Drs. Rosenberg and Tuteur, both of whom drew conclusions that were at odds with the position taken by the Department of Labor without establishing the invalidity of that position. *Cent. Ohio*, 762 F.3d at 491 ("ALJ appropriately declined to credit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL's position").

The petition for review is **denied**.