NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0466n.06

Case No. 15-4018

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 12, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| QUARTO MINING COMPANY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON PETITION FOR REVIEW OF A |
| v. | ) | DECISION AND ORDER OF THE |
| | ) | BENEFITS REVIEW BOARD, |
| DIRECTOR, OFFICE OF WORKERS' | ) | UNITED STATES DEPARTMENT |
| COMPENSATION PROGRAMS, UNITED | ) | OF LABOR |
| STATES DEPARTMENT OF LABOR AND | ) | |
| JEFFREY L. STUPAK, | ) | |
| | ) | |
| Respondents. | | |

BEFORE: SILER, BATCHELDER, and GIBBONS, Circuit Judges.

**SILER, Circuit Judge.** Jeffrey L. Stupak, a former coal miner, received a favorable determination by an administrative law judge ("ALJ") awarding him benefits under the Black Lung Benefits Act, 30 U.S.C. § 901 *et seq*. The Department of Labor's Benefits Review Board ("Board") affirmed the ALJ's decision on appeal. Stupak's former employer, Quarto Mining Company ("Quarto"), now petitions this court for review of the ALJ's decision, claiming the ALJ erred by improperly discrediting the opinions of its experts. For the reasons explained below, we deny Quarto's petition.

**I.**

Congress enacted the Black Lung Benefits Act ("BLBA") to provide benefits to coal miners "who are totally disabled due to pneumoconiosis." 30 U.S.C. § 901(a). "Pneumoconiosis" is defined as a "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." *Id.* § 902(b). Two types of pneumoconiosis exist in BLBA cases: clinical pneumoconiosis and legal pneumoconiosis. "'Clinical pneumoconiosis' consists of those diseases recognized by the medical community as pneumoconioses, i.e., the conditions characterized by permanent deposition of substantial amounts of particulate matter in the lungs and the fibrotic reaction of the lung tissue to that deposition caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1). "'Legal pneumoconiosis' includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment. This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment." *Id.* § 718.201(a)(2).

"To establish entitlement to benefits, the claimant must prove by a preponderance of the evidence that (1) he has pneumoconiosis, (2) his pneumoconiosis arose in whole or in part out of his coal mine employment, (3) he is totally disabled, and (4) the total disability is due to pneumoconiosis." *Cent. Ohio Coal Co. v. Dir., Office of Workers' Comp. Programs*, 762 F.3d 483, 486 (6th Cir. 2014) (citing *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 634 (6th Cir. 2009)). Pneumoconiosis arises out of coal employment if "any chronic pulmonary disease or respiratory or pulmonary impairment [is] significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. § 718.201(b). The claimant can demonstrate the existence of pneumoconiosis by providing "medical evidence such as a chest X-

ray, autopsy or biopsy evidence, or reasoned medical opinions, or by invoking an applicable presumption." *Cent. Ohio*, 762 F.3d at 486 (citing 20 C.F.R. § 718.202(a)). A presumption of pneumoconiosis exists if "the miner engaged in coal-mine employment for fifteen years" and has "a totally disabling respiratory or pulmonary impairment." 20 C.F.R. § 718.305(b)(1). The employer may rebut this presumption by providing evidence that the coal miner does not have either clinical or legal pneumoconiosis. *Id*. § 718.305(d)(2)(i); *see also* 30 U.S.C. § 921(c)(4).

## II.

In 2010, Stupak applied for BLBA benefits, claiming total disability as a result of lung impairment from coal dust. Due to Stupak's employment history and his "totally disabling respiratory impairment," the ALJ applied the fifteen-year presumption of disabling pneumoconiosis. After a review of the medical testimony, the ALJ determined that Quarto failed to rebut the presumption, explaining that Quarto "ha[d] not established that [Stupak]'s disability is not due to pneumoconiosis."

In addition to being exposed to coal dust, Stupak smoked cigarettes for a number of years. The testimony concerning the number of pack-years[1] Stupak smoked varied. The ALJ concluded that Stupak's self-assessment totaled twenty pack-years. Then, the ALJ averaged the other physicians' estimates with Stupak's self-assessment and concluded that Stupak had a seventeen pack-year history. Based on this information, the ALJ noted "that the claimant's respiratory disability may be due, in part, to his history of cigarette smoking."

To rebut the fifteen-year presumption and to support smoking as a cause of Stupak's respiratory problem, Quarto relied on the reports and testimony of two physicians, Drs.

---

[1] "A pack-year is one year of smoking one pack of cigarettes per day. For example, someone who smokes one pack a day for one year accumulates one pack-year, and someone who smokes two packs a day for one year accumulates two pack-years." *Arch on the Green, Inc. v. Groves*, 761 F.3d 594, 596 n.1 (6th Cir. 2014).

Rosenberg and Kline. Dr. Rosenberg diagnosed Stupak with chronic obstructive pulmonary disease ("COPD") attributable to Stupak's history of smoking, not his exposure to coal dust. Further, Dr. Rosenberg found that Stupak "does not have clinical or legal [coal workers' pneumoconiosis] [("]CWP["])]." Dr. Kline came to similar conclusions, finding that Stupak's "history and physical exam are highly consistent with emphysema," and that "Stupak's lung condition is most likely related to previous tobacco abuse." In addition, Dr. Kline indicated that pulmonary function tests "showed marked hyperinflation and an extremely impaired diffusion capacity," which are results that "are not typical of CWP."

Stupak relied on reports from Drs. Lenkey and Cohen. Dr. Lenkey opined that "[b]ased on a high degree of medical certainty, Mr. Stupak does have simple coal worker's pneumoconiosis . . . based on an abnormal chest x-ray that ha[s] been consistently reproduced." Although Dr. Lenkey acknowledged that Stupak's "emphysema is, in large part, related to his longstanding tobacco history," he noted that his extended exposure to coal dust likely contributed to his pulmonary physiologic impairment. Dr. Cohen made similar findings to those of Dr. Lenkey, specifically that Stupak's "28 years of coal mine dust exposure was significantly contributory to the development of his lung disease and resulting pulmonary dysfunction." Citing multiple pieces of medical evidence, Dr. Cohen, like Dr. Lenkey, concluded that Stupak suffered from CWP.

Last, Dr. Jones examined Stupak on behalf of the Department of Labor ("DOL"). When asked whether he could diagnose Stupak with CWP, Dr. Jones stated that he could not provide an opinion on that question. Dr. Jones also indicated that "cigarette smoking would [have] certainly contribute[d] to [Stupak's] lung capacity," but declined to answer whether Stupak would be disabled today if he had not smoked.

After reviewing the medical analysis provided by the five physicians, the ALJ discredited the opinions of Drs. Rosenberg and Kline, describing Dr. Rosenberg's opinion as internally inconsistent and Dr. Kline's opinion as contrary to the preamble of the BLBA. As a result of discrediting Drs. Kline's and Rosenberg's opinions, the ALJ relied on the other physicians' opinions in concluding that Quarto "ha[d] not met [its] burden of proof in establishing that [Stupak] does not suffer from pneumoconiosis." Finding that the ALJ properly rejected Drs. Rosenberg's and Kline's opinions, the Board affirmed the ALJ's decision.

## III.

"In black-lung-benefits cases, we review the Board's legal conclusions *de novo* and review the ALJ's decision (not the Board's) to determine whether it was supported by substantial evidence." *Cent. Ohio*, 762 F.3d at 488 (quoting *Greene*, 575 F.3d at 633). To satisfy the substantial evidence standard, the ALJ must have "adequately explained the reasons for crediting certain testimony and documentary evidence over other testimony and documentary evidence." *Morrison v. Tennessee Consol. Coal Co.*, 644 F.3d 473, 478 (6th Cir. 2011) (citing *Peabody Coal Co. v. Hill*, 123 F.3d 412, 415 (6th Cir. 1997)).

## IV.

Quarto raises two issues on appeal. First, it contends that the ALJ's rejection of Dr. Rosenberg's medical opinion was "irrational, unsupported by substantial evidence, and contrary to law." Particularly, it takes issue with the ALJ's failure to credit Dr. Rosenberg's reliance on post-preamble literature and the ALJ's alleged substitution of his judgment for that of Dr. Rosenberg's. Second, with respect to the ALJ's rejection of Dr. Kline's opinion, Quarto claims the ALJ erred by applying "an irrebuttable presumption that obstructive respiratory impairments

in retired coal miners always arise out of coal mine dust exposure." Each of Quarto's arguments will be discussed in turn.

A.

The ALJ rejected Dr. Rosenberg's opinion as to the cause of Stupak's COPD because it was contrary to the preamble. Quarto, however, claims that the ALJ "failed to consider whether the medical studies published after the preamble, on which Dr. Rosenberg partially relie[d], call into question a mechanical application of statements included in the preamble." In relevant part, the regulatory preamble provides:

> In addition to the risk of simple CWP and PMF [("progressive massive fibrosis")], epidemiological studies have shown that coal miners have an increased risk of developing COPD. COPD may be detected from decrements in certain measures of lung function, especially FEV1 [("forced expiratory volume")] and the ratio of FEV1/FVC [("forced vital capacity")]. Decrements in lung function associated with exposure to coal mine dust are severe enough to be disabling in some miners, whether or not pneumoconiosis is also present. A severe or disabling decrement in lung function is defined here as an FEV1 @65% of expected normal values; an impairment in lung function is defined as an FEV1 @80% of predicted normal values. An exposure-response relationship between respirable coal mine dust exposure and decrements in lung function has been observed in cross-sectional studies and confirmed in longitudinal studies.

Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as amended, 65 Fed. Reg. 79920-01, 79943 (Dec. 20, 2000).

Quarto does not dispute that an ALJ may rely on the preamble in certain instances but argues that the ALJ erred by not analyzing "Dr. Rosenberg's explanation that medical studies and literature published after the 2000 regulatory changes showed a parallel reduction of FVC and FEV1 in coal mine dust-induced COPD, distinguishing it from cigarette smoking-induced COPD's characteristic reduction in the FEV1 ratio." On this point, Quarto posits that where Dr. Rosenberg's opinions differ from those found in the preamble, "[t]estimony as to scientific innovations that archaize or invalidate the science underlying the preamble must be considered

and not mechanically rejected as contrary to the preamble." *See Westmoreland Coal Co. v. Cochran*, 718 F.3d 319, 324 (4th Cir. 2013). However, as Quarto acknowledges, the Board disagreed with this argument—namely, that the ALJ failed to consider the post-preamble studies cited by Dr. Rosenberg. Specifically, the Board explained that "[a]lthough [Quarto] is correct in suggesting that an expert can challenge the scientific views accepted by the DOL, that expert must establish that developments have occurred subsequent to the promulgation of the 2001 regulations that invalidate the science underlying the preamble." *See Cochran*, 718 F.3d at 324. Further, in this instance, the Board found that the ALJ "acted within his discretion as fact-finder in determining that Dr. Rosenberg's opinion was insufficient to establish that claimant's COPD/emphysema, and accompanying obstructive impairment, was not caused by dust exposure in coal mine employment." *See A & E Coal Co. v. Adams,* 694 F.3d 798, 801-02 (6th Cir. 2012); *Cornett v. Benham Coal, Inc.,* 227 F.3d 569 (6th Cir. 2000).

In spite of the Board's finding otherwise, Quarto maintains that "Dr. Rosenberg's conclusions about the causation of Mr. Stupak's lung disease meet the legal standard suggested by the Board." Instead of discussing the recent scientific developments, the ALJ, Quarto contends, summarily rejected Dr. Rosenberg's research, in violation of the requirements of the APA and the BLBA. *See* 5 U.S.C. § 557(c)(A); 30 U.S.C. § 923(b). Further, Quarto argues that the Board's reliance on *Cochran* is misplaced, suggesting that "neither expert [in *Cochran*] 'testified as to scientific innovations that archaized or invalidated the science underlying the Preamble.'" *See Cochran*, 718 F.3d at 324. Quarto maintains that, unlike the expert in *Cochran*, Dr. Rosenberg provided literature that undermines the preamble. Specifically, Dr. Rosenberg reported that:

> Recently, Kohansal in the American Journal of Respiratory and Critical Care Medicine . . . investigated the natural history of chronic airflow obstruction

> beginning in the early 1970s for a period of approximately 28 years, utilizing the Framingham offspring cohort. This investigation probably represents the most thoroughly studied population to date pertaining to the natural history of COPD. Kohansal determined that the annualized decline of FEV1 for healthy "never" smoking males was 19.6cc/year. In contrast, the mean drop in FEV1 for smokers was 38.2cc/year or 27.1 cc per pack-years of cigarettes smoked. Thus, the difference between the two groups namely smokers and nonsmoker of approximately 9cc/year, represents the annual fall in $FEV_1$ attributed to cigarette smoking alone. This figure exceeds by 80%, the 5cc/year reported by Attfield and Houdos, in regards to the annual FEV1 loss caused by smoking. Thus, the loss of FEV1 caused by smoking far exceeds that caused by coal mine dust exposure. Cigarette smoking is thus typically much more destructive demonstrating larger decrements than Attfield initially believed.

Relying on Kohansal's work, Quarto consistently reiterates that the ALJ "needed to consider whether scientific advancements revealed by this literature have negated the medical literature addressing the effects of coal mine dust exposure on the lungs that was endorsed by the DOL in the preamble."

To fully understand the present case, we must address prior decisions involving studies that differentiate between the effects of coal dust and cigarette smoke. In a published decision, this court found that "[t]he ALJ appropriately declined to credit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL's position that 'coal mine dust exposure may cause COPD, with associated decrements in FEV1/FVC.'" *Cent. Ohio*, 762 F.3d at 491 (citation omitted). We explained that:

> Dr. Rosenberg may be right as a matter of scientific fact, but his analysis plainly contradicts the DOL's position that COPD caused by coal-dust exposure may be associated with decrements in the FEV1/FVC ratio. The ALJ was entitled to consider the DOL's position and to discredit Dr. Rosenberg's testimony because it was inconsistent with the DOL position set forth in the preamble to the applicable regulation. Central Ohio does not challenge the substance of the DOL's position as articulated in the regulation's preamble—that is, Central Ohio does not argue that COPD resulting from coal-dust exposure is not correlated with a reduced FEV1/FVC ratio. Were Central Ohio to make that argument, this court would need to engage the substance of that scientific dispute. But this court could do that only after Central Ohio submitted "the type and quality of medical evidence that would invalidate" the DOL's position in that scientific dispute. Central Ohio

has presented no such evidence, and it asks this court to make no such determination. The sole issue presented here is whether the ALJ was entitled to discredit Dr. Rosenberg's medical opinion because it was inconsistent with the DOL position set forth in the preamble, and the answer to that question is unequivocally yes.

*Id.* at 491-92 (citations omitted). A year later, this court again rejected Dr. Rosenberg's opinion, noting that he "offered the same rationale . . . to reach a conclusion that coal-dust exposure did not cause the claimant's disability." *Quarto Mining. Co. v. Marcum*, 604 F. App'x 477, 483 (6th Cir. 2015) (per curiam). Additionally, this court held that while *Central Ohio* "leaves open the possibility that a mining company could muster medical evidence that would invalidate the position taken by the Department of Labor in the preamble," Dr. Rosenberg provides "nothing to distinguish his evidence from the evidence that he relied upon, and that we rejected, in *Central Ohio*." *Id.* at 484. As a result, we found that the ALJ did not err by discrediting Dr. Rosenberg's opinion on the basis that it conflicted with the preamble. *Id.*

After *Central Ohio* and *Marcum*, Quarto is left with one simple question: has it produced evidence different from what this court previously rejected? Quarto contends that "Dr. Rosenberg relies on medical articles not at issue" in *Marcum* and *Central Ohio*. But Quarto fails to offer any explanation as to how these articles reflect a different rationale or provide different evidence than the articles this court found insufficient in *Central Ohio* and *Marcum*. Quite plainly, Dr. Rosenberg's summation of Kohansal's research demonstrates that it involves the same underlying conclusion as the articles cited in *Central Ohio*: "Kohansal undermines the idea that cigarette smoking and coal dust cause the same amount of decrement in lung function. In fact, Kohansal goes on to show that cigarette smoking causes much more significant decrements than coal dust over time." *Cf. Cent. Ohio*, 762 F.3d at 491 ("In short, Dr. Rosenberg suggests that, contrary to DOL's purportedly oversimplistic definition, there *may be forms of COPD that*

*are not correlated with a reduced FEV1/FVC ratio*, and those forms of COPD *are much more likely to be associated with coal-dust exposure*." (emphasis added)). However, Quarto "does not argue that COPD resulting from coal-dust exposure *is not correlated with a reduced FEV1/FVC ratio*." *Cent. Ohio*, 762 F.3d at 491 (emphasis added). Rather, Dr. Rosenberg cites to a different article that addresses similar conclusions that this court has rejected twice in both *Central Ohio* and *Marcum*.[2]

Quarto also claims that the ALJ failed to weigh the credibility of the post-preamble studies cited by Dr. Rosenberg. The BLBA requires that ALJs examine "all relevant evidence" when assessing the validity of a claim. 30 U.S.C. § 923(b). Similarly, the APA mandates that an ALJ articulate his "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A).

Contrary to Quarto's belief, the ALJ did not "merely not[e] the existence of evidence" and fail to "assess the persuasiveness or credibility of the post-preamble articles on which Dr. Rosenberg relie[d]." Rather, the ALJ's analysis demonstrates that he examined the scientific research cited by Dr. Rosenberg, considered a contrary explanation offered by Dr. Cohen, noted recent case law, and analyzed the preamble. Though the ALJ did not give a lengthy explanation for discrediting Dr. Rosenberg's opinion, he was not obligated to do so. *See Big Branch Res.,*

---

[2] Although Quarto characterizes Kohansal's work as recent, this court is not the first to have found no error on the part of an ALJ in relying on the preamble instead of Kohansal's conclusions. In a recent Fourth Circuit case, the employer contended, much as Quarto does here, that Kohansal's study is "precisely the type of scientific evidence regarding the effect of cigarette smoking on lung function which can inform a physician regarding a smoker's lung condition," and that "[t]he Preamble cannot preclude medical opinions based upon studies which now show that smoking causes much more and much more diverse damage to the lungs than thought twelve years ago." Reply Brief for the Petitioner at *7-8, *Westmoreland Coal Co. v. Dir., Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 540 F. App'x 152 (4th Cir. 2013) (No. 12-1879), 2012 WL 5388600. The Fourth Circuit rejected the employer's argument, finding that the employer's physicians' "explanations for discounting his lengthy history in the coal mines as a cause of his emphysema were insufficient in light of the science underlying the preamble to the regulations implementing the Act." *Id.* at 154 (per curiam). Two years later, the Fourth Circuit again dispensed with a similar argument from an employer. *Compare McElroy Coal Co. v. Dir., Office of Workers' Comp. Programs*, 624 F. App'x 101, 102 (4th Cir. 2015) (per curiam), *with* Brief for Petitioner at *26-28, *McElroy*, 624 F. App'x 101 (No. 15-1322), 2015 WL 3575855.

*Inc. v. Ogle*, 737 F.3d 1063, 1073 (6th Cir. 2013) ("Rather than review whether the ALJ has meticulously discussed every piece of evidence that may be missing, we review merely whether he has reviewed all relevant evidence, applied the proper legal standard, and reached a conclusion based on substantial evidence."). Thus, the ALJ adequately analyzed post-preamble research presented by Dr. Rosenberg and therefore did not err.

Next, Quarto takes umbrage at the ALJ's analysis of Dr. Rosenberg's theory of "pseudo-restriction," contending that the ALJ usurped the role of Dr. Rosenberg as an expert in this case by applying his own assessment of the research. According to Quarto, the ALJ's discussion of Dr. Rosenberg's theory demonstrates a "misreading of Dr. Rosenberg's opinions about (1) which exposure, cigarette smoke or coal mine dust, causes 'pseudo-restriction,' and (2) the relationship between air trapping and the pulmonary measurements of residual volume and total lung capacity." Conceding that the ALJ understood the mechanics of the "pseudo-restriction" theory espoused by Dr. Rosenberg, Quarto contends that the ALJ erred by "by constructing logical flaws that do not exist."

Quarto's main concern with the ALJ's analysis is the belief that the ALJ misattributed "pseudo-restriction" occurring in legal pneumoconiosis to smoking-induced emphysema as well. The chart provided by Dr. Rosenberg associates "pseudo-restriction" with legal coal worker's pneumoconiosis and indicates that "*airtrapping forces a decrease* in the FVC, which normalizes the ratio in the setting of obstruction." Dr. Rosenberg explained in the report accompanying the charts that "the diffuse emphysematous process related to cigarette smoking often is associated with large lung volumes (increased total lung capacity), *coupled with air trapping* (increased RV/TLC)." After briefly discussing Dr. Rosenberg's report, the ALJ reasoned that "[i]f increased air trappings reduce FVC as opined by Dr. Rosenberg, they only do so if total lung

capacity remains sufficiently unenlarged. However, Dr. Rosenberg states that the diffuse emphysematous process related to cigarette smoking is often related to *larger* lung volumes."

Based on the tenor of Quarto's objection, it seeks to have this court engage in a de novo review of the ALJ's analysis of Dr. Rosenberg's conclusions. But "[a]n ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). There is no indication that the ALJ misunderstood Dr. Rosenberg's explanation of the pseudo-restriction process or that he believed that the process involves legal pneumoconiosis. This is not to say that the ALJ necessarily was correct in identifying the alleged inconsistency, just that it did not constitute a "specious inconsistency."[3] This conclusion applies equally to Quarto's objection to the ALJ's finding that Dr. Rosenberg's conclusions were "incoherent." Further, in light of the ALJ's analysis of the broader dispute concerning the impact of coal dust versus cigarette smoke, the ALJ's findings of fact and weighing of the credibility of the expert are supported by substantial evidence.

## B.

Quarto claims the ALJ erred by finding Dr. Kline's opinion in conflict with the preamble. Dr. Kline opined that:

---

[3] Quarto's reliance on *Milburn Colliery Co. v. Hicks*, 138 F.3d 524 (4th Cir. 1998), for its contention that the ALJ inappropriately weighed the internal inconsistency of Dr. Rosenberg's opinion is misplaced. In *Hicks*, the Fourth Circuit found that the ALJ erred by affording more weight to the claimant's testimony than conflicting medical evidence on a question of whether the claimant suffered a totally disabling respiratory impairment. 138 F.3d at 533. *Hicks* does not stand for the proposition that an ALJ cannot weigh internal inconsistencies in an expert's report. In fact, the ALJ in *Marcum* rejected one of the DOL's physician's opinions for being "internally inconsistent." 604 F. App'x at 482. Additionally, this court rejected a similar argument by an employer that the ALJ impermissibly weighed Dr. Rosenberg's opinion, explaining that the ALJ "merely fulfilled his role as fact-finder by evaluating the credibility of Dr. Rosenberg's conclusions." *Dixie Fuel Co., LLC v. Dir., Office of Workers' Comp. Programs*, No. 15-3553, 2016 WL 1719117, at *9 (6th Cir. Apr. 29, 2016) (citing *Tenn. Consol. Coal Co. v. Crisp*, 866 F.2d 179, 185 (6th Cir. 1989); *Moseley v. Peabody Coal Co.,* 769 F.2d 357, 360 (6th Cir. 1985)).

> Mr. Stupak's lung condition is most likely related to previous tobacco abuse. His history and physical exam are highly consistent with emphysema and not CWP. The PFTs in our office showed marked hyperinflation and an extremely impaired diffusion capacity. These changes are not typical of CWP either. Thus, Mr. Stupak's employment at the mine did not cause his lung condition (emphysema).

The ALJ rejected Dr. Kline's conclusion, explaining that Dr. Kline's "opinion is at odds with medical science acknowledged by the Preamble, which establishes that 'dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms.'" 65 Fed. Reg. at 79,943. By arriving at this conclusion, Quarto asserts that "the ALJ unreasonably transform[ed] a preamble to regulatory changes from (1) a statement of scientific principles linking coal mine dust exposure with obstructive lung diseases, into (2) an irrebuttable presumption that obstructive respiratory impairments in retired coal miners always arise out of coal mine dust exposure." The Board disagreed with the position that Quarto posits, finding the ALJ properly afforded little weight to Dr. Kline's opinion.

Although an ALJ is not obligated to rely on the preamble when determining the credibility of expert opinions, an ALJ may do so. *A & E Coal Co.*, 694 F.3d at 802. Quarto previously conceded this point in its discussion concerning Dr. Rosenberg: "[t]here is no dispute that the DOL's view of the state of relevant scientific knowledge, as reflected in the 2000 preamble, may be relied upon in appropriate cases." *See A & E Coal*, 694 F.3d at 802. But Quarto claims that Dr. Kline's opinion is not necessarily in conflict with the preamble. The relevant passage from the preamble indicates "that dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms—namely, the excess release of destructive enzymes from dust- (or smoke-) stimulated inflammatory cells in association with a decrease in protective enzymes in the lung." 65 Fed. Reg. at 79943. Based on this passage, Quarto contends that the diffusion capacity from smoking-induced and coal dust-induced emphysema—the

mechanism cited in Dr. Kline's report—is not one of the mechanisms that the preamble indicates might be similar. Quarto suggests that the preamble should be read narrowly to mean that "similar mechanisms" is limited to "the excess release of destructive enzymes from dust- (or smoke-) stimulated inflammatory cells in association with a decrease in protective enzymes in the lung." In the alternative, Quarto contends that "even if this preamble passage could be read as . . . foreclosing any opinion that coal dust-and smoking-induced emphysema involve any different mechanisms at all . . . . [d]iffusing capacity is not a 'mechanism' by which emphysema occurs . . . but a specific measurement of [how] well the lungs are functioning."

We reject Quarto's arguments. First, the use of the word "namely" in the preamble does not necessarily preclude the existence of other similar mechanisms; it might simply be highlighting one specific example. Second, Dr. Kline offers no support for his conclusion that diffusion capacity does not fall into the category of "similar mechanisms." Finally, Quarto's alternative position appears to be an attempt to insert additional scientific arguments with no indication that they were presented to the ALJ, which this court is not obligated to entertain. *See Cent. Ohio*, 762 F.3d at 490. As a result, the ALJ did not err by affording little weight to this opinion.

Lastly, Quarto faults the ALJ for discrediting Dr. Kline's opinion on the basis that he equivocated concerning "his assessment of the impact of an alpha-1 antitrypsin deficiency." According to Quarto, "[t]he ALJ's criticism fails to address the fact that Dr. Kline's primary conclusion was that Mr. Stupak's emphysema was due to smoking and not to coal mine dust." With respect to Dr. Kline's opinion on the alpha-1 antitrypsin deficiency, the ALJ noted as follows:

> Moreover, Dr. Kline equivocates with respect to his assessment of the impact of an alpha-1 antitrypsin deficiency when he notes that it is a "possible" cause. For

these reasons, Dr. Kline's medical opinion that claimant's impairment was not caused by his occupational coal dust exposure fails to support a finding that claimant's respiratory impairment is not due to CWP.

Quarto is under the belief that the ALJ rejected Dr. Kline's opinion in its totality solely based on Dr. Kline's equivocation on the alpha-1 antitrypsin deficiency. This is inaccurate, and the ALJ's opinion reveals such. In the two paragraphs preceding the discussion of the alpha-1 antitrypsin deficiency, the ALJ specifically rejected Dr. Kline's main conclusion: that he could differentiate between smoke-induced and coal-induced emphysema. The transitional language—that is, the use of the word "moreover"—indicates that the ALJ did not jettison Dr. Kline's opinion only on his equivocation concerning the alpha-1 antitrypsin deficiency but that the ALJ merely rejected it along with the Dr. Kline's main conclusion. Thus, this last argument has no merit.

V.

For the reasons explained above, we find that the ALJ's decision is supported by substantial evidence. We also find no error requiring remand. Accordingly, Quarto's petition is **denied**.