RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

WILGAR LAND COMPANY; OLD REPUBLIC INSURANCE
COMPANY,

*Petitioners*,

*v.*

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, U.S. DEPARTMENT OF LABOR; LINDA ROSE
ADAMS, obo and widow of Tony Lee Adams,

*Respondents*.

┐
│
│
│
│
> No. 22-3709
│
│
│
│
┘

On Petition for Review from the Benefits Review Board;
Nos. 21-0216 BLA; 21-0217 BLA.

Argued: April 26, 2023

Decided and Filed: October 31, 2023

Before: SUTTON, Chief Judge; BATCHELDER and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Mark E. Solomons, GREENBERG TRAURIG LLP, Washington, D.C., for Petitioners. William M. Bush, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent OWCP. Evan B. Smith, APPALRED LEGAL AID, Prestonsburg, Kentucky, for Respondent Adams. **ON BRIEF:** Mark E. Solomons, Michael A. Pusateri, GREENBERG TRAURIG LLP, Washington, D.C., for Petitioners. William M. Bush, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent OWCP. Evan B. Smith, APPALRED LEGAL AID, Prestonsburg, Kentucky, for Respondent Adams.

———————————

**OPINION**

———————————

MURPHY, Circuit Judge.   The Black Lung Benefits Act authorizes benefits for coal miners who have "pneumoconiosis."   The Department of Labor's regulatory definition of this term covers an obstructive lung disease such as emphysema if the disease arises from coal-mine work.   Over two decades ago, the Department responded to criticisms of this broad definition in a regulatory "preamble" to its final regulation.   The preamble interpreted the then-existing scientific studies to establish that coal-mine work can cause obstructive diseases, either alone or in combination with smoking.   The administrative law judge who awarded benefits in this case repeatedly relied on this preamble to discredit a coal-mine operator's three experts.   In this petition for review, the operator argues that the judge wrongly treated the preamble as legally "binding."   We disagree.   The judge simply found the preamble more persuasive than the experts.   So we deny the operator's petition for review.   But we caution administrative law judges that their conclusions may lack substantial evidence if they over-rely on the preamble for propositions that it does not contain.

I

A

After years of working in dust-filled coal mines, many miners develop a respiratory condition medically known as "pneumoconiosis" and commonly known as "black lung disease."   *See Nat'l Mining Ass'n v. Dep't of Lab.*, 292 F.3d 849, 854 (D.C. Cir. 2002) (per curiam).   To help these miners, Congress passed remedial legislation now known as the "Black Lung Benefits Act."   30 U.S.C. § 901(b); *see id.* §§ 901–44.   Congress has given the Department of Labor substantial authority to oversee this Act.   *See, e.g.*, 30 U.S.C. §§ 921(a); 932(a), (h).

The Department's regulations require the applicable coal-mine operator to pay benefits to miners who can prove four elements: that they have "pneumoconiosis"; that the disease "arose out of coal mine employment"; that they are "totally disabled"; and that the disease "contributes to" this disability.   20 C.F.R. § 725.202(d)(2).   After a miner dies, eligible survivors may also

apply for benefits.  Survivors automatically qualify if the Department has found a miner eligible before the miner's death.  30 U.S.C. § 932(l).  Survivors otherwise must prove two of the same elements (that the miner had "pneumoconiosis" that "arose out of coal mine employment") and one new element (that the miner's death was "due to" the pneumoconiosis).  20 C.F.R. § 718.205(a).

This case raises a question about the first element: What does it mean for a miner to have "pneumoconiosis"?  The Act contains a broad definition of this word.  It provides: "The term 'pneumoconiosis' means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  30 U.S.C. § 902(b).

Historically, courts interpreted this text to cover two general conditions.  *See Campbell v. Consolidation Coal Co.*, 811 F.2d 302, 304 (6th Cir. 1987); Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, As Amended, 65 Fed. Reg. 79,920, 79,938 (Dec. 20, 2000).  Most obviously, courts read the definition to reach diseases that the "medical profession" describes as "pneumoconiosis," including "coal worker's pneumoconiosis." *Campbell*, 811 F.2d at 304.  These diseases manifest themselves through the "reaction of lung tissue to dust inhalation, resulting in characteristic patterns or markings on chest X-rays." Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 62 Fed. Reg. 3,338, 3,343 (Jan. 22, 1997).  Doctors refer to these diseases as *restrictive* because they restrict the total amount of air that lungs can *inhale*.  *See Gulf & W. Indus. v. Ling*, 176 F.3d 226, 229 n.6 (4th Cir. 1999).

More controversially, courts interpreted the definition to cover emphysema, chronic bronchitis, and other chronic obstructive pulmonary diseases if miners show that their particular disease arose "out of coal mine employment."  30 U.S.C. § 902(b); *see, e.g.*, 65 Fed. Reg. at 79,943–44 (citing cases).  Doctors refer to these diseases as *obstructive* (rather than restrictive) because they obstruct the lungs' ability to *exhale*.  *See Gulf & W. Indus.*, 176 F.3d at 229 n.6. The inclusion of obstructive diseases in the statutory definition proved controversial because some experts believed that coal dust did not cause the diseases and that they had other causes, such as smoking tobacco.  65 Fed. Reg. at 79,938.  The experts essentially argued (in the language of toxic-tort cases) that a lack of "general causation" existed between coal dust and

obstructive diseases. *Cf. Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). Some courts allowed coal-mine operators to rely on these expert views. *See Blakley v. Amax Coal Co.*, 54 F.3d 1313, 1321 (7th Cir. 1995). This precedent raised the prospect of a never-ending battle over the general-causation issue in every case, even though the issue should have one right answer that would "not vary from case to case[.]" 65 Fed. Reg. at 79,938.

This state of affairs concerned the Department. In the late 1990s, it engaged in a notice-and-comment rulemaking to "foreclose litigation attempting to narrow the definition [of pneumoconiosis] on a claim-by-claim basis with medical opinions which exclude obstructive lung disorders from" coal-mine work. 62 Fed. Reg. at 3,343. The rulemaking led to the regulatory definition of "pneumoconiosis" that exists today. 20 C.F.R. § 718.201(a).

The regulation defined the word "pneumoconiosis" to include both "medical, or 'clinical', pneumoconiosis and statutory, or 'legal', pneumoconiosis." *Id.* "Clinical pneumoconiosis" covered "diseases recognized by the medical community as pneumoconiosis[.]" *Id.* § 718.201(a)(1). "Legal pneumoconiosis" covered any other "chronic lung disease or impairment and its sequelae arising out of coal mine employment." *Id.* § 718.201(a)(2). This second part of the definition expressly covered "any chronic restrictive or *obstructive* pulmonary disease arising out of coal mine employment." *Id.* (emphasis added).

The regulation also clarified two other things. For one thing, it noted that a specific miner's obstructive disease could "aris[e] out of coal mine employment" if the disease was "significantly related to, or substantially aggravated by, dust exposure in" the miner's coal-mine work. *Id.* § 718.201(b). We have read this text to apply to any obstructive disease that developed "in part" from coal-mine work even if it also developed in part from the miner's smoking habit. *Arch on the Green, Inc. v. Groves*, 761 F.3d 594, 598–99 (6th Cir. 2014). For another thing, the regulation recognized that pneumoconiosis can present as a "latent and progressive disease which may first become detectable only after the cessation of coal mine dust exposure." 20 C.F.R § 718.201(c).

The Department also drafted an extensive "preamble" that accompanied the final regulation, which became effective in 2001. In this preamble, the Department acknowledged

that many commenters attacked the proposed definition on the ground that coal-mine work could not cause obstructive diseases. *See* 65 Fed. Reg. at 79,938. The preamble then summarized dozens of studies that supported a contrary finding and concluded that the record "contain[ed] overwhelming scientific and medical evidence demonstrating that coal mine dust exposure can cause obstructive lung disease." *Id.* at 79,944; *see id.* at 79,938–44. The preamble noted further that "[s]mokers who mine have additive risk for developing significant obstruction." *Id.* at 79,940.

B

This legal backdrop matters because this case involves a claimant, Tony Lee Adams, who developed an obstructive disease after smoking and working in coal mines. Adams was born in 1960 and lived in eastern Kentucky. He married his wife Linda in 1981. Having quit school after the eighth grade, Adams worked on and off in coal mines between 1979 and 1995. He stopped working in 1995 when his last employer closed its mines. An administrative law judge found that he worked a total of "10.36 years" as a coal miner. Petitioners' Appendix ("App."), at 379.

Adams struggled to breathe after his retirement. He had started smoking when he was 18 and averaged "around a pack" a day for most of his life. Respondent's Supplemental Appendix ("Supp. App."), at 32. Adams also spent most of his coal-mining career underground using a "cutting machine" to extract coal "at the face of the mines[.]" Supp. App. 48, 99. This job regularly required him to work in the "dustiest" areas. *Id.* at 48.

Adams filed his first application for federal black-lung benefits in 1998. An administrator denied this claim because, among other reasons, he failed to prove that he had pneumoconiosis. Adams did not appeal.

Ten years later, Adams filed the application at issue here against Wilgar Land Company and its insurer, Old Republic Insurance (collectively, "Wilgar"). For the next decade, his claim bounced among administrators, administrative law judges, and the Benefits Review Board on grounds that we need not discuss.

Sadly, Adams passed away in 2013. His treating physician, Dr. Mahmood Alam, identified his causes of death on his death certificate as cardiopulmonary arrest, emphysema, coal worker's pneumoconiosis, throat cancer, and aspiration pneumonia. Adams's widow, whom we refer to as Mrs. Adams to differentiate her from her husband, took over Adams's benefits claim and filed a separate claim for survivor's benefits.

The proceedings relevant now started in 2019. That year, a new administrative law judge took over the case. The judge's notice of assignment told the parties "that the Court may look to the preamble to the revised . . . regulations in weighing conflicting medical opinions and determining their credibility." App. 142. This statement led Wilgar to request discovery from the Department on who had drafted the preamble, the meaning of various statements within it, and the scientific studies that supported its conclusions. The administrative law judge granted a protective order to prevent this discovery on relevancy grounds.

After a hearing, the judge awarded benefits to Mrs. Adams in a 72-page opinion. *Id.* at 437. We must consider only one of his many findings: that Adams had "legal pneumoconiosis" within the meaning of 20 C.F.R. § 718.201(a)(2). App. 408–31. Wilgar and Mrs. Adams did not dispute that Adams suffered from a "chronic lung disease or impairment," namely, chronic obstructive pulmonary disease, emphysema, asthma, and chronic bronchitis. 20 C.F.R. § 718.201(a)(2); App. 408. But their dueling experts debated whether Adams's obstructive impairment arose exclusively from his lengthy smoking habit or at least partly from "dust exposure" in his coal-mine work. 20 C.F.R. § 718.201(b); App. 412–31.

Mrs. Adams relied mainly on Adams's treating physician, Dr. Alam. Alam's final report viewed smoking as the "main cause" of Adams's obstructive disease but added that Adam's coal-mine work had substantially aggravated it. Supp. App. 58. The administrative law judge gave this opinion "controlling weight." App. 418. All things being equal, a treating physician's opinion is "entitled to more weight" under the regulations. 30 C.F.R. § 718.104(d)(1); App. 414–15, 418. Dr. Alam's opinion also tracked with the preamble's suggestion that coal-mine work and smoking can have "additive effects" on lung disease. App. 418. And Alam had used estimates of Adams's employment and smoking histories that roughly matched the judge's estimates. *Id.* at 417–18.

Wilgar relied on three experts who opined that Adams's smoking exclusively caused his obstructive lung disease: Drs. Thomas Jarboe, David Rosenberg, and Peter Tuteur. The judge gave "little weight" to these opinions. *Id.* at 422, 428, 430. Of most note, the judge repeatedly discredited the experts' statements because the judge believed that they conflicted with the discussion in the preamble to the 2001 regulation. *Id.* at 419, 421, 425–27, 430. The judge added a few other reasons to discredit the opinions. Dr. Jarboe, for example, overestimated Adams's smoking history, while Dr. Rosenberg underestimated his coal-mine work. *Id.* at 422–24.

The Benefits Review Board affirmed the award of benefits to Mrs. Adams. *Id.* at 561. As relevant now, the Board upheld the judge's weighing of the expert opinions on the question whether Adams had legal pneumoconiosis. *Id.* at 555–59. When doing so, the Board held that the judge properly looked to the preamble to discredit Wilgar's experts. *Id.* at 558.

II

Wilgar sought our review of the Board's decision. We generally review the Board's legal conclusions de novo and the administrative law judge's factual findings for substantial evidence. *See Cent. Ohio Coal v. Dir., Off. of Workers' Comp. Programs*, 762 F.3d 483, 488 (6th Cir. 2014). In this case, however, it is difficult to decipher the nature of Wilgar's challenge. Wilgar's briefs leave no doubt that it disapproves of the administrative law judge's use of the preamble to the 2001 regulation. But those briefs do not clearly identify the type of error that the judge allegedly made. So we will start by resolving the legal issue that Wilgar plainly preserved and end by disclaiming resolution of other issues that Wilgar forfeited or abandoned.

A

Wilgar primarily argues that the administrative law judge erred under the Administrative Procedure Act (APA) by treating the preamble as binding. Its major premise is right: the preamble is not binding. But its minor premise is wrong: the judge did not treat it that way.

*Major Premise*: Wilgar correctly notes that the preamble cannot "bind" private parties. To show why, we start with some APA basics. Congress often delegates to agencies the power

to adopt substantive standards of conduct that "bind private parties." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019); *Chrysler Corp. v. Brown*, 441 U.S. 281, 295 (1979). The APA requires agencies to jump through various procedural hoops before issuing these "legislative" or "substantive" rules. *See Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022). An agency must give notice of the rule. It must allow parties to comment on the rule's merits. And it must respond to the comments. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); 5 U.S.C. § 553(b)–(c).

Yet the APA carves out "interpretive" rules from these notice-and-comment requirements. *Perez*, 575 U.S. at 96; *see* 5 U.S.C. § 553(b)(A). These types of rules offer the agency's views on what a regulation means or on how the agency will enforce it, but the rules do not have independent legal force. *See Perez*, 575 U.S. at 96–97. Unlike legislative rules, then, an adjudicator may not treat them as binding "in the adjudicative process." *Id.* at 97 (citation omitted). This principle covers regulatory "preambles" that respond to comments at the last stage of the notice-and-comment process when the agency issues a final rule. *See Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1043–44 (6th Cir. 2018); Kevin M. Stack, *The Interpretive Dimension of Seminole Rock*, 22 Geo. Mason L. Rev. 669, 691 n.120 (2015). While a preamble's interpretation of regulations may help clarify any ambiguity in them, an agency cannot use preambles to add substantive duties that the regulations themselves do not contain. *See Tenn. Hosp. Ass'n*, 908 F.3d at 1043.

This framework applies here. Wilgar does not dispute that the Black Lung Benefits Act delegates to the Department of Labor the power to decide what conditions qualify as "pneumoconiosis" under that term's statutory definition. *Cf.* 30 U.S.C. § 932(h). We thus may assume that the Department could lawfully issue its "pneumoconiosis" definition in 20 C.F.R. § 718.201(a). The Department also proceeded through notice-and-comment rulemaking when adopting this definition. Indeed, the Department responded to the "comments" that it received about the definition in the very preamble that Wilgar challenges. *See Perez*, 575 U.S. at 96. So Wilgar also makes no claim that the definition itself failed to satisfy the Department's APA duties.

That said, the Department's preamble to the 2001 regulation (including the preamble's comments about the regulatory definition) did not go through the same process. Nobody got notice of the preamble's statements about the scientific evidence undergirding the definition. And nobody got to comment about the statements. To be valid, then, the preamble must qualify as an interpretive rule that binds neither Wilgar nor the administrative law judge. *See id.* at 96–97. That is exactly how courts have interpreted it: as mere guidance. *See A & E Coal Co. v. Adams*, 694 F.3d 798, 801–02 (6th Cir. 2012); *see also Peabody Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 746 F.3d 1119, 1125 (9th Cir. 2014); *Harman Mining Co. v. Dir., Off. of Workers' Comp. Programs*, 678 F.3d 305, 315–16 (4th Cir. 2012). So Wilgar rightly recognizes that an administrative law judge would commit legal error by treating the preamble as binding in an individual case. *See Arch on the Green*, 761 F.3d at 601; *see also Huscoal, Inc. v. Dir., Off. of Workers' Comp. Programs*, 48 F.4th 480, 494 (6th Cir. 2022) (Thapar, J., concurring).

But just because the preamble does not bind administrative law judges does not mean they must ignore it. Our caselaw permits them to use it for various purposes. To begin with, courts may look to the preamble—just as they may look to other interpretive guidance—to clarify ambiguities in the regulation. *See A & E Coal*, 694 F.3d at 801–02. For example, the regulatory definition covers "any chronic . . . *obstructive* pulmonary disease arising out of coal mine employment." 20 C.F.R. § 718.201(a)(2) (emphasis added). The preamble "explains why" the Department "amended" the regulation to add obstructive diseases. *A & E Coal*, 694 F.3d at 802. It did so both because of the "overwhelming scientific and medical evidence" that coal dust can cause these conditions and because claimants should not have to litigate this general-causation question in every case. 65 Fed. Reg. at 79,938, 79,944. The preamble thus clarifies that a mine operator's argument "that coal-dust exposure cannot cause" obstructive diseases would be "inconsistent" with the regulation, which suggests that the exposure can at least sometimes cause them. *A & E Coal*, 694 F.3d at 802; *see Huscoal*, 48 F.4th at 493.

In addition, our precedent allows an administrative law judge to use the preamble for more than just interpreting the regulation—the normal domain of interpretive rules. More unusually, we (and many other courts) have held that these judges may rely on the preamble's

statements of scientific fact when resolving evidentiary disputes in particular cases. *See Arch on the Green*, 761 F.3d at 601; *Little David Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 532 F. App'x 633, 636 (6th Cir. 2012). Under this caselaw, a judge may assign more weight to an expert opinion that comports with the "medical principles accepted by the" Department as compared to an expert opinion that conflicts with those principles. *Lemarco, Inc. v. Helton*, 559 F. App'x 465, 468 (6th Cir. 2014); *see Island Creek Coal Co. v. Belt*, 835 F. App'x 8, 16 (6th Cir. 2020); *Ky. Prince Mining Co. v. Dir., Off. of Workers' Comp. Programs*, 800 F. App'x 410, 413 (6th Cir. 2020); *Star Fire Coals, Inc. v. Dir., Off. Of Workers' Comp. Programs*, 792 F. App'x 372, 377 (6th Cir. 2019); *Island Creek Coal Co. v. Hill*, 739 F. App'x 825, 832 (6th Cir. 2018); *Cent. Ohio Coal*, 762 F.3d at 491–92; *see also Blue Mountain Energy v. Dir., Off. of Workers' Comp. Programs*, 805 F.3d 1254, 1259–62 (10th Cir. 2015); *Peabody Coal*, 746 F.3d at 1125–26; *Harman Mining*, 678 F.3d at 315; *Helen Mining Co. v. Dir., Off. of Workers' Comp. Programs*, 650 F.3d 248, 256–57 (3d Cir. 2011); *Consolidation Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 521 F.3d 723, 726–27 (7th Cir. 2008). This precedent thus seems to allow judges to treat the preamble as additional scientific "evidence" in black-lung cases.

*Minor Premise*: Wilgar's argument fails because the administrative law judge who awarded benefits to Mrs. Adams adhered to this legal framework. At nearly every turn, the judge recognized that the preamble did not bind him. When assigned the case, the judge made clear that he might "look to the preamble" in his credibility assessments (as our cases permit). App. 142. But he did not suggest that he must follow this document. The judge reiterated this point when rejecting Wilgar's request to seek discovery about the preamble. The judge reasoned that he had a duty to follow only federal laws and regulations and that "[t]he preamble is not a law or regulation." *Id.* at 196. And while circuit courts allow the judge to use the preamble "when weighing and evaluating the credibility of statements made by medical experts," Wilgar remained free to challenge "the science credited by the Department in the preamble." *Id.* at 197.

The judge's opinion awarding benefits to Mrs. Adams stuck to these principles. The judge again noted that our precedent permitted (but did not require) him to rely on the preamble's scientific views when making credibility assessments. App. 410 n.111 (citing *A & E Coal*, 694 F.3d at 801–02). And the judge nowhere suggested that he was bound by the

preamble or that Wilgar could not challenge its views. *Id.* at 410. To the contrary, the judge acknowledged that finders of fact must decide whether coal dust caused a particular miner's obstructive disease "on a claim-by-claim basis" rather than on any categorical basis tied to the preamble. *Id.*

In response, Wilgar concedes that the judge *formally* disclaimed the notion that he must follow the preamble. Yet Wilgar argues that the judge's "magic words" cannot save his opinion because the judge *practically* treated the preamble as binding. Reply Br. 4 (citation omitted). As support for this claim, Wilgar offers five examples in which the judge used the preamble to summarily discredit its experts' opinions. But none of these examples shows that the judge thought that the law required him to follow the preamble. To the contrary, they show only that the judge found the preamble's statements more persuasive than Wilgar's experts.

*Example One*: Two of Wilgar's experts, Drs. Jarboe and Rosenberg, opined that smoking was the sole cause of Adams's obstructive disease based on their views concerning the relationship between two pulmonary-function tests. App. 419, 424–25. One of these tests (the "forced vital capacity" or "FVC" test) identifies a person's total lung capacity by measuring the amount of air that the person can exhale after a deep breath; the other test (the "forced expiratory volume in one second" or "FEV1" test) measures the amount of air that a person can exhale in just one second. *Cent. Ohio Coal*, 762 F.3d at 491 n.3. The lower the "FEV1/FVC ratio" (that is, the longer it takes a person to exhale the total amount of air that the person can inhale), the more likely the person has an *obstructive* condition that makes it difficult to exhale. *See* 65 Fed. Reg. at 79,943. According to Wilgar's two experts, smokers typically have lower FEV1/FVC ratios because it takes them longer to exhale (and so they have a lower FEV1) whereas their total lung capacity (their FVC) remains steady. But Wilgar's experts assert that the ratio typically stays the same for coal-mine workers because coal dust proportionally decreases both the amount they can exhale in a second (FEV1) and their total lung capacity (FVC). Because the ratio declined drastically for Adams, the experts concluded, smoking (not coal dust) must have caused his lung disease.

Wilgar notes that the administrative law judge gave this claim little weight because it conflicted with the preamble's view that coal dust can cause obstructive diseases (the diseases

that manifest themselves in a lower FEV1/FVC ratio). App. 425 (quoting 65 Fed. Reg. at 79,943). But Wilgar identifies nothing in the judge's opinion that suggested he *must* follow the preamble's claim. And we have repeatedly noted that a judge may find the preamble more persuasive than an expert's opinion on this FEV1/FVC ratio issue. *See Ky. Prince Mining*, 800 F. App'x at 413–14; *Robert Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 753 F. App'x 350, 358–59 (6th Cir. 2018); *Cent. Ohio Coal*, 762 F.3d at 491–92. Indeed, if treated as a categorical rule, the experts' claim would conflict with the regulation itself—not just the preamble. Any broad-based argument that coal dust never lowers the FEV1/FVC ratio is simply the scientific way of arguing that coal dust never causes obstructive diseases. And we have held that the latter type of claim runs afoul of our reading of 20 C.F.R. § 718.201(a)(2). *See Huscoal*, 48 F.4th at 493. The judge did have a duty to follow this regulation.

*Example Two*: Dr. Rosenberg opined that emphysema caused by coal dust is focal (located in particular areas of the lungs) because of the larger dust particles, whereas emphysema caused by cigarettes is "more diffuse" (spread out in the lungs) because of the smaller smoke particles. App. 426. Rosenberg determined that Adams had diffuse emphysema. *Id.* The administrative law judge found this claim inconsistent with the preamble's statement that "dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms[.]" *Id.* (quoting 65 Fed. Reg. at 79,943). Here again, Wilgar points to nothing in the judge's explanation to suggest that he felt bound to credit the preamble's "similar mechanisms" claim. And here again, we have held that a judge may credit this part of the preamble over an expert's opinion. *See Quarto Mining Co. v. Dir.*, *Off. of Workers' Comp. Programs*, 657 F. App'x 428, 436–37 (6th Cir. 2016).

*Example Three*: Wilgar next criticizes the administrative law judge's other reason to discredit Dr. Rosenberg's reliance on the difference between focal and diffuse emphysema. Even apart from the claim that dust-induced and smoke-induced emphysema occur through similar mechanisms, the judge reasoned that Rosenberg failed to account for a different fact: Adams was *both* a smoker and a miner. App. 426. The judge chose to give Rosenberg's opinion "less weight" because Rosenberg did not consider the possibility that coal dust could have been "a contributing or aggravating factor" to Adams's diffuse emphysema. *Id.* To support this

conclusion, the judge cited the preamble's repeated suggestion that smoking and coal dust can have "additive effects" on a miner's obstructive disease. *Id.*; *see* 65 Fed. Reg. at 79,939–41. For a third time, however, the judge's logic did not treat the preamble's statement as binding. And for a third time, we have recognized that judges may give less weight to experts who do not account for these "additive effects" or explain why the effects would not exist for a miner. *See Belt*, 835 F. App'x at 16; *Hill*, 739 F. App'x at 832; *see also Consolidation Coal Co. v. Shipley*, 2022 WL 402432, at *4 (4th Cir. Feb. 9, 2022); *Energy W. Mining Co. v. Est. of Blackburn*, 857 F.3d 817, 828–29 (10th Cir. 2017).

*Example Four*: Two of Wilgar's experts (again Drs. Jarboe and Rosenberg) argued that coal mining could not have caused Adams's obstructive disease because he had relatively normal lung function several years after he retired from mining. App. 421, 427–28. The judge discredited this logic because he found it "contrary to the principle that pneumoconiosis can be a latent and progressive disease" that develops after a miner stops working. *Id.* at 421, 428. Unlike Wilgar's other examples, however, this conclusion had nothing to do with the preamble. The Department placed the "latency" principle in the regulation itself. 20 C.F.R. § 718.201(c). The judge did have a duty to follow that regulation. So we have held that a judge may discredit a medical opinion that fails to account for this latency possibility. *See Consol of Ky., Inc. v. Eskut*, 734 F. App'x 964, 969 (6th Cir. 2018); *Sunny Ridge Mining Co. v. Keathley*, 773 F.3d 734, 738–39 (6th Cir. 2014).

*Example Five*: Wilgar's third expert, Dr. Tuteur, opined that Adams's obstructive disease arose from smoking based on statistical studies showing that obstructive impairments arise much more often from smoking than from coal dust. App. 428–29. The judge gave this opinion little weight because Tuteur's "general statistics" did not fit Adams. *Id.* at 430. The studies compared smokers who did not mine to miners who did not smoke. App. 428–29. But Adams was a "miner who also smoked." *Id.* at 430. Tuteur did not explain how the studies helped show whether Adams's mining contributed in part to his disease. *Id.* We and other courts have rejected Tuteur's use of general statistics on this basis. *Island Creek Coal Co. v. Young*, 947 F.3d 399, 408–09 (6th Cir. 2020) (citing cases). Besides, the judge's analysis on this

issue again had nothing to do with the preamble.  So it does not support Wilgar's claim that the judge treated the preamble as binding.

Apart from these examples, Wilgar's other arguments also fail to convince us that the judge believed he had to follow the preamble.  Wilgar notes that the particular judge in this case has "invariably" cited the preamble to discredit a mine operator's experts in many other cases. Petitioners' Br. 31 & n.6.  So what?  This history shows that the judge finds the preamble more persuasive than the experts.  It does not show that the judge treats the preamble as binding.

Wilgar also urges us to consider "[t]raining materials" for administrative law judges that supposedly direct them to discredit various expert opinions.  *Id.* at 32.  Yet these materials did not make their way into the "exclusive" administrative record in Adams's case.  5 U.S.C. § 556(e).  We also doubt that they qualify as the type of "public law documents"—like the regulations or the preamble—that can be considered even though outside the record.  *A & E Coal*, 694 F.3d at 802 (quoting *Harman Mining*, 678 F.3d at 316).  Regardless, these materials would not change things.  They predate the Department's appointment of the administrative law judge in this case.  Wilgar thus identifies nothing but speculation that the judge even knew about them.  And, as Wilgar concedes, the judge has explained that he would disregard any "nonbinding" training materials that conflicted with the law.  Petitioners' Br. 33 n.7.  Most of Wilgar's selected examples from the training materials also discuss a judge's duty to reject opinions that conflict with the *regulation*, including the parts indicating that coal dust can contribute to obstructive diseases, *see* 20 C.F.R. § 718.201(a)(2), (b), and that pneumoconiosis can be latent, *see id.* § 718.201(c).  These examples say nothing about the preamble's binding nature.

Wilgar lastly points out that the Benefits Review Board in a Fourth Circuit case reversed an administrative law judge's opinion because the judge failed to consider the preamble when denying benefits.  *Consolidation Coal*, 2022 WL 402432, at *2.  Yet, as the Fourth Circuit held, the Board did not say that the judge must *follow* the preamble—only that the judge must *consider* it.  *See id.* at *3–4.  In any event, nothing of the sort happened here.  Nobody directed the judge to consider the preamble.  So we need not address whether we would have followed this

unpublished decision or Judge Quattlebaum's competing views. *See id.* at *7–8 (Quattlebaum, J., dissenting).

## B

Our conclusion that the administrative law judge did not treat the preamble as binding suffices to resolve this case. We end by highlighting the things that Wilgar's briefing touched upon, but that we find forfeited or abandoned and so save for another day.

*First*, Wilgar did not preserve a challenge to the scientific statements in the preamble. Because the preamble does not bind administrative law judges, they may freely reject its scientific conclusions if they find a particular expert's contrary testimony more convincing. *See, e.g.*, *Quarto Mining Co.*, 657 F. App'x at 433–35; *Quarto Mining Co. v. Marcum*, 604 F. App'x 477, 484 (6th Cir. 2015) (per curiam). And if a mine operator argues that the judge wrongly chose the preamble's scientific conclusions over its expert's, we would "need to engage the substance of the scientific dispute"—presumably by asking whether substantial evidence supported the judge's choice between the two. *Cent. Ohio Coal*, 762 F.3d at 491. At first blush, Wilgar's briefing could be read to raise this type of claim. For instance, the first header in its opening brief noted: "Having Challenged the Substance of [the Department's] Position as Articulated in the Preamble, Wilgar Was Entitled to Meaningful Engagement With the Scientific Dispute Presented." Petitioners' Br. 18. At oral argument, however, Wilgar's counsel immediately conceded that its legal argument was "not asking this court to . . . mediate any scientific dispute" between the preamble's conclusions and its experts' conclusions. Oral Arg., at 0:51–56. We take Wilgar at its word.

*Second*, and relatedly, Wilgar's opening brief pointed out that the administrative law judge denied its request for preamble-related discovery to help it engage in this scientific dispute. Petitioners' Br. 19. But the Board held that Wilgar had forfeited any argument about the judge's discovery decision in its appeal to that entity. App. 558 n.18. So Wilgar's reply brief agrees that this case does not involve "a mere discovery dispute." Reply Br. 1.

*Third*, and most notably, Wilgar did not raise a traditional substantial-evidence challenge to the administrative law judge's findings about the experts to credit and discredit. In its reply

brief, Wilgar hinted that Dr. Alam's opinion could not provide the "substantial evidence" required to uphold the finding that Adams's coal-mine work partially caused his obstructive disease. *See, e.g.*, Reply Br. 21–23. This type of claim would have required Wilgar to prove that no "reasonable mind" could have credited Dr. Alam's analysis over the contrary views of its experts. *Huscoal*, 48 F.4th at 489 (citation omitted). But Wilgar forfeited the claim by not raising it in its opening brief. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018).

That said, much of Wilgar's substantive arguments relate more to this type of challenge than to the legal argument that the company did raise. And if it had preserved such a substantial-evidence challenge, we might have found this case close even under that deferential standard. On the one hand, Dr. Alam's opinion simply concluded—with barely any reasoning—that Adams's coal-mine work partially caused his obstructive impairment. In other contexts, we have suggested that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) (quoting *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

On the other hand, some of the administrative law judge's reasons for discrediting Wilgar's experts look open to debate. Consider a few examples. The judge relied on the preamble to reject the part of Dr. Rosenberg's opinion tied to Adams's FEV1/FVC ratio. Yet Rosenberg agreed with the preamble that coal dust (like cigarette smoke) can have an "effect" on this ratio. Wilgar Ex. 25, at 10. His view that smoking caused Adams's obstruction turned on the "pattern and magnitude of" the "reduction" in Adams's unique case. *Id.* It is not clear to us that the preamble's general statements about the ratio have any "bearing on" this more specific opinion. *Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 258 (4th Cir. 2016). And just because we permit administrative law judges to rely on the preamble does not mean that they can cite it for claims that it "is wholly silent on." *Consolidation Coal*, 2022 WL 402432, at *9 (Quattlebaum, J., dissenting).

Likewise, the judge rejected Dr. Rosenberg's reliance on the fact that Adams's obstructive disease arose after he stopped coal mining because this reliance conflicted with the

principle that pneumoconiosis can be a "latent and progressive disease" that develops after the miner's coal-mine work. 20 C.F.R. § 718.201(c). But Rosenberg did not dispute that the disease *can* develop later. Wilgar Ex. 25, at 15. Relying on the preamble's "scientific literature," he asserted only that this type of delayed onset is "rare" and that nothing in Adams's case suggested it was a rare one. *Id.* Neither the preamble nor the regulation indicates otherwise. Indeed, when defending against an APA challenge to this regulation back in 2002, the Department conceded as much. *See Nat'l Mining Ass'n*, 292 F.3d at 869. The agency offered a "narrowing construction" of this subsection, suggesting that it barred coal-mine operators from arguing only that pneumoconiosis can "*never*" be "latent and progressive." *Id.* at 863, 869. Having adopted that narrow reading to save the regulation, the Department can hardly take the opposite view in individual cases.

Finally, the judge seemed to reject Dr. Tuteur's opinion in part based on a disdain for "general statistics" tied to large-scale scientific studies that evaluate the relative risks of developing obstructive diseases from coal dust or smoking. App. 430. Yet one might think that large-scale epidemiological studies of the type that Tuteur cited should carry more scientific weight than the anecdotal observations of a treating physician. *See Zeigler Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 312 F.3d 332, 335–36 (7th Cir. 2002). For example, as Judge Easterbrook has explained, "the Food and Drug Administration would not dream" of approving a new drug without these types of general studies showing its effectiveness. *Id.* at 336.

All that said, we can leave these concerns for another day. None of the concerns suggests that the administrative law judge treated the preamble as binding. So none supports the legal argument that Wilgar preserved in this case. We thus deny its petition for review.